A list of five cases, but before taking up those submitted and argued cases, there is a motion for the admission of two young lawyers to the bar of the Court of Appeals for the Federal Circuit. And since I will be the movement, I will surrender the presiding duties to Judge Rader, my active judge colleague, and then my law clerks will suffer the decision of our colleague Judge Plager and Judge Rader. He's recusing himself. Very honorable, but not very wise. May it please the Court. I move the admission of Jessica Christine Kaiser, who is a member of the Bar in Good Standing of the highest court of the state of Illinois, and of Stuart Madison Rosenberg, who is a member of the Bar in Good Standing of the highest court of the state of California. I have extensive personal knowledge of their credentials, and I am satisfied from that personal knowledge that they indeed possess all the necessary qualifications for admission to the bar of this court and much more. So the motion is before the panel. Judge Plager, do we need to debate this? I would think so, at least. But under the circumstances, I'll second the motion. OK, well, then I have to grant it. Congratulations. Please raise your right hand. I swear or affirm that you will report yourselves as attorneys and counsels of this court, uprightly and according to the law, and that you will support the Constitution of the United States of America. Congratulations, and welcome to the United States Court of Appeals. Thank you both, and thank you, Circuit Executive and Clerk of the Court. I'll just say a word here that each of us in the active status have three law clerks, and each of our senior colleagues one. And we are highly dependent on these very diligent young men and women who come and serve our court, usually for a year, sometimes two years, with the difficulty of the cases and their quantity. It's hard to imagine how we could accomplish our work in a proper and expeditious manner without very diligent assistance from these young lawyers. So I just say that as an expression of gratitude to Ms. Kaiser and Mr. Rosenberg, but to all of the law clerks that serve the court. Now on the business at hand, the panel has two cases which will be submitted without argument today on the briefs, namely, Appeal 2007-3126, Stickler v. Department of Defense, and Appeal 2007-7246, Bechtel v. Department of Veterans Affairs. On the argument list, we'll hear argument first in Appeal No. 1169, Computer Docking v. Dell. Mr. Dorman, welcome to you. Thank you, Your Honor. Good afternoon. Please proceed. Good afternoon. Your Honor, by our count, there are now over 40 published decisions from this court on the issue of disavowal and disclaimer. And if the lower court's judgment were affirmed, we believe this case would be unique among them. This court has never found that an invention- But why would we need to reach the disavowal standard? Why aren't we just interpreting what the specification does when it distinguishes microcomputers from laptops? Your Honor, first of all, if the court is referring to the- File 1, lines 7 through 22 sets forth the distinctions. The district court seems to rely on those. Why aren't we just seeing if that is done correctly? Because that subject matter is not addressing, and it has no lexicographical significance. That is simply an overview of what exists at the time, a hierarchy of all of the types of different computers. But you're saying we're a microcomputer, we're not a laptop. No, we've never said that. The word microcomputer does not appear in any claim. But it does appear in the specification, and we're looking to interpret the term portable computer. Why wouldn't we consult that specification which identifies that term with microcomputer and seems to distinguish the term laptop? Your Honor, at no time, although they're describing historically microcomputers, and he's also discussing microcomputers in the spec, there is no intent evidenced by the spec to transport any definitional authority over to the language of the claims. If we focus on the key to this case, I believe it's simple. What is the invention? And what the invention speaks to is the flexibility that you get in portability from the invention of a single connector that allows, once made into a docking station, all of the peripherals that would attach to that docking station to be in communication with the microprocessor through the single connection. And as the specification teaches, as the figures show, as the file history shows, that attribute, that feature, can be beneficial and realized in any number of computers, including laptop computers, so long as they are portable. You do agree then that all of the peripherals have to go through that one fitting? All of the peripherals on the docking station have to go through that one fitting. What we don't agree with, and where the dispute is, is that all of the peripheral ports that appear on the housing have to also be replicated on the docking station. That's where the fight is. But we absolutely agree that this, because you cannot capture the full benefit, the portability, flexibility benefit of this invention unless every port that's on that docking station is in communication with the microprocessor through that single connection. And understanding that is the invention. But that doesn't mean, in your view, that every port on the computer has to go through the single connection. Is that your position? They all have to go through the microprocessor. Yeah, but they don't all have to go through that one connection on their way to the docking station. That's true. That's how I understand it, is that the connectivity is that each is a dedicated line of the microprocessor, but there is not a bus that operates at this level for the port, for the docking station. And that's in fact, if you understand that to be the invention, that can be practiced in a laptop, and indeed the applicant states as much expressly in the file history and language that was completely ignored by the court in connection with the matter below. It said that a single connector to implement all of the interfaces provides an easy connection and disconnection and may be used to advantage with laptop computers. Stated. Now if there was an intention not to apply to laptop computers, that would have never been said. But what he did is he said more than that. He followed in that same paragraph. The applicant went on to explain in that same paragraph how other laptop systems using a single connector to implement a system bus. Where are we looking at? We're looking at the file history, Your Honor. Can you give me the site real quick? Yes, it's on one of the references in appendix 758. There's an entire paragraph. It's on page 15 of the particular file history. 758. 758 is one reference to it. Okay, I'm there. Okay. The second full paragraph. It starts, a single connector to implement all of the interface provides for easy connection and disconnection and may be used to advantage with laptop computers as well. Suggesting that look, this invention, you get to choose. What in fact this applicant did in the file history is he said you have great flexibility with this. If you take a laptop computer and the footprint of a laptop and it's got a display and a keyboard with a certain weight, you can choose if you choose to practice our invention not to have the keyboard and the display on it and have the same size and the same weight to give you additional computing power, additional memory capability, and that's a design choice. I mean you can choose to do that or not have them. And you can see from the figures that he provides in the patent that there are alternative embodiments that do and do not actually include the displays and the keyboards with the particular computer. But your honor, in that paragraph I directed you to, where he goes on, there are other laptop systems which dock via single connector, but these systems only implement the system bus. But it's a single connector for all connections, right? Correct. And again, it's from a microcomputer, a microprocessor. It's a single connection to the microprocessor that is in the house. That's what we're talking about. We're talking about being able to take a computer system that has a microprocessor, has memory in it, that may or may not have a display and keyboard and put it on a single connector, a docking station, and through that single connector and the pins, every single port that is on that docking station that is resident in different locations, depending on how you practice this, is going to have different peripherals in this location. Everything communicates. It's the data link, the single data link through these dedicated pins that go through that single connection up to the microprocessor. And that invention, the flexibility you get from using that single connection, you can have a display, not have a display. It's all according to the mix that you want with respect to dedicated peripherals and locations and how much processing capability and memory you have. But much of this prosecution history is distinguishing Heron, which was a docking station for a laptop. That's true. But the basis on which… And the microprocessor, again, seems to be distinguished from the laptop. I think if you read… Microprocessor being better than the laptop idea. Isn't that a lot of your distinction? Well, a lot of the distinction focuses upon, in a particular design choice, that you can carry much more computer processing and much more memory than you can with a laptop if you choose that design choice. And that's what they're talking about in the first reference on the page before at 757. But they also explain that… Looking again, just quoting from some of your prosecution history you haven't given us, the Heron system allows a laptop computer to interface with other peripheral devices. This laptop computer does not possess the utilities and functionalities of the invention. Why is that? Well, it's distinguishing the laptop from… But if you continue to read, how is it distinguishing? And the way it's distinguishing it is that it doesn't have the single connector. And it doesn't have the single connector that provides all this flexibility, which… And this is what's so important. He goes on to say, if it did have it, laptops could benefit from it. So clearly, if you take the file history that you're describing and the following two paragraphs and read it in the whole part of this that was not even addressed by the lower court, what they're talking about is… Look, he could have said and didn't, Heron's a laptop computer. We don't. We're not a laptop computer. And that would have been it and we wouldn't have been here. But they didn't say that. What they instead said is, in one embodiment of our invention we can have these benefits or we have increase. But additionally, we have this single connector. And with respect to that feature, laptops also can benefit by using that feature. And that being the case, it's not appropriate, I believe, under the law for us to read out laptops from the scope of this invention and these claims. The claims talk about a portable computer. Well, if you read through this, the patent and the prosecution history always treats keyboards as peripheral devices, displays as peripheral devices, which again suggests that a laptop which inherently contains them is different from what you're talking about in your invention. This patent does not universally treat displays and keyboards as peripheral devices. In the embodiments... Well, show me where it doesn't. Figure 15, for example. If we're talking about... Figure 15. What this patent talks about is it describes the... Can you tell me what I'm missing here in Figure 15? Hold on a minute. I mean, I see a picture of something that doesn't look any different from Figure 13 or Figure 14. And Figure 13 clearly has a detached keyboard. Well, but Figure... That's true. Figure 13, in that case, has a detached keyboard but has an attached display. And why isn't 15 just an extenuation of Figure 13? Am I missing something? Yeah. Let me... Descriptions. Excuse me one second. Yeah, I'd have to... The descriptions... Figure... Figure 13, if we read column 2, down at line 64, Figure 13 shows a possible configuration of the microcomputer system that includes a keyboard, a visual display, and a DC power source. Now, what was important, what was distinguished in this patent, this patent is agnostic as to whether or not a particular keyboard or display is permanently attached, fixably attached. It doesn't matter. In this case, what they're talking about is that here is one where the display is attached. And... In the file history, they're explaining how this same single connection benefit and flexibility exists and provides benefits for laptops as well. Counsel, let me ask you a question. As we will shortly hear from the other side, you can pick and choose and cherry-pick through this patent, through the written description, and you can cherry-pick through the file wrapper, the prosecution history, and you can find phrases and language. I agree with that. And stuff on either side of the tape. I agree with that. And so we can't do that. So, what are we to do? The trial judge spent quite a bit of time on this case and wrote quite an extensive and comprehensive analysis of the sense of the overall patent. And admittedly, she could have written it the other way, couldn't she? Yes. The answer is yes. She could have written it the other way, of course. You wish she had. But she didn't. She happened to write it the way she did. And now, we could write it the other way, but we could probably equally write it her way. What do you suggest we do? I'm running out of time. As an advocate, when I receive an order from a court and I'm on the losing side, my measure of the quality of the work that the judges did, even when I lose, is did they address my best argument? And if they did, did they do it forthrightly? The carefully reasoned opinion that this judge below did, and that she spent a lot of time, is just wrong. It's that the single most important fact, which is the express statement in the file history that this includes laptops, that those are embodiments that can benefit, if that was taken in the context of everything, would have resulted in a different outcome. Because these, you know, this is my 15th Federal Circuit argument, and what I've come to learn about these cases, these disability, these disavowal cases, is that you do have to look at the totality, but you have to focus on what the invention is. That's really what we're talking about. What the invention is, in this case... There is the one sentence that says, a single connector to implement all of the interfaces provides for easy connection and disconnection and may be used to advantage with laptop computers. It's not that single sentence. The entire paragraph that continues also speaks to other laptop computer systems and how those other laptop computer systems can benefit from this particular one. Can I save some time for the panel? Thank you so much. Mr. Canuso? Welcome to you. Good afternoon. Thank you, Your Honor. It's my pleasure to appear before this panel. I am, with the permission of Dallin Gateway, appearing on behalf of them as well as Toshiba. Mr. Dorman started out with a very pertinent statement for the public's decisions on disavowal. I believe essentially that what is before this court is not a debate on what the law is or how it should be applied. I do believe, as I believe Judge Rader mentioned, it is really an interpretation of two main documents. The specification for the patent and five pages from the file of history. It is three human beings given permission by Markman and other precedent to assess from a point of ordinary skill in the art and the context in which statements are written. Did the inventors define their invention? Did they distinguish it from prior art in a way that defines a clear and unmistakable... Deal with the statement that he read to us from the prosecution history. Absolutely. Turning to appendix page 588. The sentence Mr. Dorman is referring to, Your Honor, is referring to the applicant's... Sorry, page 590. A single connector, quote, a single connector to implement all of the interfaces provides for easy connection and disconnection and may be used to advantage with laptop computers as well. I believe that that is the single sentence they rely upon as Mr. Dorman extends it to the entire paragraph. That is fine. That sentence is clearly explaining to the reader that a feature of the invention, i.e. the single connector, may be used in laptops. That's expressly consistent with two sentences later where they say and concede the prior art laptops included single connectors. So this statement is really nothing but a transition from paragraphs directed to distinguishing the microcomputer, the portable microcomputer of the invention from laptops and going to their second distinction which is single connectors existed in the prior art are single connectors different. The difference is that all of the ports are replicated. That's what that sentence goes to. Now, we could debate whether that seems like a poor transition. It creates, obviously, the ambiguity that the court may be wrestling with. But in our mind, it has nothing to do with the distinction previously debated and discussed by the inventors that our invention is not a laptop. Considering the 40 cases that may be in existence on disavowal and recognizing, in my mind, that essentially our debate is not with those cases but the application of the law to the facts of this case, I believe that the district court got it right in concluding a clear and unmistakable disclaimer. Why? Because she did not base it on a single isolated statement in the specification. She did not base it on a single isolated statement in the prosecution history. The statements were not a mistake in any sense of the word. They were not erroneous. They were arguments directed to patentability. They were arguments raised in the face of a rejection over prior laptop computers. The patent attorney and the inventors did what they were supposed to do. They distinguished the prior from their invention. Well, the specification is not altogether clear. Looking at figure 15, which we discussed earlier, it talks about there the keyboard and display being in a single housing, therefore not being treated as peripheral devices, as you suggest they should be treated. Actually, I would respectfully disagree. They are treated as peripheral devices, but they are detachably connected in figures 13, 14, and 15. And this is a particular embodiment. Figure 13 does not show the thumbscrew, but shows number 65. Figure 14 shows the 65 with the thumbscrew. Clearly, 13 and 14 go together. 15 is simply the embodiment of figure 13 and 14 in a collapsed, compact, transportable form. The context for which figures 13 and 14 and 15 are described in the specification is to treat them together. Well, if the inventors didn't have in mind something like a laptop or some version of a laptop, then what are they talking about when they're talking about a portable computer that can go into a docking station? They're certainly not talking about the thing that's under my desk upstairs, right? I assume you're referring to a personal desktop computer, yes. The big box, that's what I'm referring to, not the dog or the cat. Yes. What are they talking about? They are talking about a portable version of your desktop computer. The background of the invention really sets, in Ergo's language, the inventor's language, the hierarchy. They were very clear. It's a rare ability to understand how the inventors were distinguishing different animals and birds. In 1991, the word minicomputer would probably not signify what we're thinking today. Microcomputer, probably a PDA. But in 1991, a computer was IBM Blue. A minicomputer was a large server on wheels that a company depended upon. The microcomputer, as maybe antiquated as that term is today, in 1991, Ergo said, is your desktop computer. Laptops, the bottom rung of that ladder. What is our invention? Our invention is a portable desktop. How do we make that? We create the box under your desk, make it a little bit smaller, but maintain the power of that box with a number of redundant connectors. One, a set of individual connectors, and one, a single connector. Now you get to take that thing under your desk, and go with you wherever you want, recognizing that you now have to plug that in to a docking station in which your monitor, keyboard, mouse, printer are already set up. That was the advantage. That's why it was easy, and it makes sense, to distinguish from laptops. They say, we can see the portability of printers, displays, keyboards, etc. We can see that in exchange for more power. And that's the distinction. It is a portable desktop computer. And that's different from a laptop. Laptops would not have served that function. And the file history, the five pages at issue here, running from page 589 of the appendix to 592, are continuing, consistent identifications of those distinctions. And I think the language from the last paragraph of appendix 589 on page 14 of the file history responds to the top of page 15, are clear disavowals. But dealing with disavowals, we've got to have clear and unmistakable evidence. Unmistakable is a pretty high standard. And when we start muddying it up with little statements here and there, how unmistakable does it become? Right in context, Your Honor, I would respectfully disagree that there are no muddying statements. The statement that CDSC raises as the statement that, allegedly, Judge Crabb did not consider, I don't think muddies the water. It certainly has given us pause, but I don't think it muddies the water, because when you have, in context as a whole, Your Honor, statements like, thus, laptop machines, now it's not talking about Heron, or the particular Heron laptop. It says, quote, thus, laptop machines make concessions in memory, display, and other areas in favor of portability, period. The applicant system, on the other hand, is a portable, full-service, microprocessing system, which concedes portability of peripherals, which is what I was suggesting, Your Honor, before. That statement, alone, I would say, is clear and unmistakable. But we don't have to address whether it is or not. This Court can take comfort that there are many statements consistent with that in the file history, the response at issue, and in the specification. The muddying, the alleged muddying of the water is really that single statement, which, in our mind, the only fair reading is that it relates to an aspect of the invention, having applicability to the other animal, i.e., the laptops. And, in fact, consistent with that, conceding that laptops of the prior era have a single connector. So, in those 40 cases, which represent the spectrum of disavowal, you have a wide variety of outcomes in which the Court has been asked to assess or interpret the record before them. And I think that's where we're here today. We're in between. We have a comforting position. We don't have to rely upon one statement that is magically going to make or break the clear disavowal. We have, as a whole, a number of statements, and we've cited them in our brief. On the all-connections limitation, the word all is in the claim, so we get to go right to the claim. CDSC would suggest to us that the word all really means less than all. It means a subset of all, because it is tied to the word plurality, and, as we all recognize, plurality undisputably means two or more. But in the file history, page appendix 592, in that same Office Action Response, on page 17, the inventors gave a real-life pragmatic explanation of why all connections are made, and that is, all of the connectors on the rear of the computer must be lined up with their mates on the docking module before the two units can be attached. This can lead to system damage such as bent pins. In that statement, the inventors are properly recognizing the flaw of the prior art. When you have to disconnect and connect a plurality of peripherals, you're going to inevitably need to bend pins. Our invention, on the other hand, let's duplicate those in a single connector. That way, you minimize that risk. CDSC would have us interpret all to mean a subset. They get to pick. In the embodiment shown in the specification, there's eight peripherals. Under CDSC's interpretation, and I think this shows the absurdity of their interpretation, they could choose two of those connectors, run them through the single connector, and connect peripherals through seven connectors instead of eight. That cannot possibly be what was contemplated by the statements in the file history. When they said all, they meant replicating all. All of the plurality. All of the plurality, right. To suggest for a moment that you get to pick... Plurality suggests that it's not all, right? There's got to be something in the plurality and something out. Correct. Divorced from this specification in your file history, you might theoretically reach that question, but we don't have to because the specification clearly says all. Duplicating, replicating all. Even as innocuous as the abstract says the use of the docking station allows all peripheral connections to be realized. That tells me the inventors enter this system, this patent system that we have. They go in thinking our invention is duplicating all so we can eliminate this cross-pollination of wires and cables and bent pins. It wouldn't make sense. If, in fact, the interpretation should be a subset, CDSC gets to look at an accused device and pick and choose which peripherals, it would read on the prior art. The prior art had a single connector connected to a docking station, presumably to connect at least some. Their distinction was we do all. I don't think that leaves out here. If there are no other questions, Your Honor, I'm prepared to cede my time. Thank you, Mr. Dorman. Two minutes for a vote. Thank you, Your Honor. Moving first to the all connections limitation, what I understand from counsel is that he agrees or concedes that it is the plurality, not all, with respect to how the claim reads if you trace all the antecedents, that his position is that because the specification repeatedly uses an embodiment that's all, that we should somehow be limited to that in connection with the claimant. That's what I understand the state of the argument to be. If that's the state of the argument, the reason why that is wrong is that there is no requirement, as this Court has repeatedly said, that embodiments disclosed restrict the breadth of the claims. And, in fact, if we look, the claim differentiation argument, if you look at Claim 4, Claim 4, which is dependent on Claim 1, describes the all as all, which, by definition in Claim 1, is the plurality that we're talking about. So, you know, I think that it's clear that the claim construction does not require, as is the case right now and the case before us, that every single one of the ports in the housing be replicated at the docking station. And I want to go back, in the 40 seconds that I have left, to what counsel said when Judge Rader, you addressed, you said, well, tell me about that. What's the significance of that language? And he says, it's just a feature. You know, it's just something, you know, it's just in there, it's just a feature, the single connector. I'd ask you to reflect on this. It's not just a feature. It is the sine qua non of this invention. The language that he had to come up with, or that the inventors had to come up with to get allowance, which is that long language that has those two elements that I described in the opening brief in 43, that language had to be in every claim, and that language is the language that basically provided this invention with its flexibility that it could be used in any number of permutations as a design choice only, whether you put a display on it and carried it around, or whether you had the displays located where the docking station was, that was your choice. And where the thus language was used, where thus the laptop machines make concessions in memory, that read in context with the next laptop-specific discussion. He was simply saying that the laptop machines necessarily make concessions in memory, and my invention gives you the flexibility that you decide. Alright, thank you. The appeal is submitted.